DECISION
This matter is before the Court for decision on the merits after a jury-waived trial and defendant's motion to dismiss.
Plaintiff corporation, as assignee of Peachtree Bankcard Corporation, is in the business of providing credit card processing services to businesses. On October 21, 1991 the parties entered into a Merchant Processing Agreement (MPA) with Myrna Mallett signing as president of The Mac Shop, Inc. (Mac Shop) and as a personal guarantor. Plaintiff subsequently extended credit card processor payments on charge cards for defendant Mac Shop. Plaintiff claims that it is owed $20,243.07 and that Myrna Mallett failed to honor her unconditional and personal guarantee. Defendant counters that plaintiff has no claim against Mac Shop, because there is no written assignment, thus, can have no claim against the personal guarantor. Mac Shop claims that it properly processed credits through net remittances or the issuing of store credit. The record, defendant argues, cannot support the conclusion that there were 14 unfunded chargebacks. (In fact, defendant does not concede that any of the alleged chargebacks are valid. See FN 4 — Defendant's Post-Trial Memorandum).
Initially, the Court declares Card Establishment Services, Inc. (CES) to be a proper plaintiff as assignee of the Peachtree Bankcard Corporation (Peachtree). David Trujillo, the chargeback collection manager for First Data Merchant Services testified that the MPA was assigned to CES in a merger of Peachtree's successor-in-interest, Harbridge Merchant Services, Inc., into Card Establishment Services, Inc. Holdings Corporation. (See Exhibit G.) Rhode Island General Laws § 9-2-8 requiring written assignments of nonnegotiable choses in action does not pertain to a "chargeback" which occurs when a customer returns goods or is not credited, requiring the merchant to pay the money back.
Mr. Trujillo explained that the purpose of an MPA is to establish a relationship between the four main components of a credit card transaction. Those parties are identified as: (1) the customer cardholder who makes the purchase; (2) the merchant (Mac Shop, Inc.) who receives funds for goods or services provided; (3) the credit card processor (Peachtree Bankcard Corporation) which funds the merchant; and, (4) the issuing bank which receives payment from the cardholder and in turn funds the processor. In the instant case there is a fifth party, a personal guarantor, who backs up the merchant's liabilities.
The chargeback procedure commences when the cardholder disputes an item on a Mastercard or Visa statement. This could result from an erroneous charge or a failure to credit the cardholder for returned merchandise. The disputed item would be reviewed by the issuing bank which would request a sales slip from the processor. The processor would send the information to the merchant requesting the sales slip for the transaction. When the processor receives the information from the merchant it is then sent back to the issuing bank which in turn forwards it to the card holder to show proof of sale. If the documentation is not provided to the processor and, hence, not to the issuing bank, the issuing bank issues a chargeback. The bank would credit the cardholder and the processor would have to collect the moneys from the merchant.
Mr. Trujillo testifed exhaustively about the chargebacks which Mac Shop did not repay.
Defense counsel vigorously objected to the admission of Exhibits 2 and 3 which support plaintiff's claim.
Defense counsel conducted an extremely lengthy voir dire of Mr. Trujillo concerning the documents and the Court admitted them in full. The credible testimony of Mr. Trujillo and the supporting documentation, for which Mr. Trujillo provided a most intricate explanation, demonstrate that Mac Shop has $20,243.07 in chargebacks outstanding.
Mrs. Mallett, an optician presently residing in Florida, testified that she did sign the MPA (Exhibit 1) while serving as president of The Mac Shop, Inc. She also signed the agreement as a personal guarantor. In October of 1993 she resigned her post, which was then assumed by her husband, due to Mac Shop's filing for bankruptcy. Mrs. Mallett testified that in March of 1995 she received a call from some representative of Harbridge Merchant Services informing her that Mac Shop account was being closed. On or at March 7, 1995 she received a letter from Harbridge Merchant Services indicating that Mac Shop account was closed. During the telephone conversation she told the caller that she had nothing to do with Mac Shop and that it was her husband who should be called with regard to the letter. Mrs. Mallett never informed Harbridge Merchant Services she was no longer president of Mac Shop nor did she respond to the reference to her obligation to pay chargebacks surviving the termination of the agreement.
Mitchell Mallett, presently working as a network integrator, testified that he was the general manager of Mac Shop in 1991. The shop's business was computer retailing, training and services. Mr. Mallett testified that he made all the decisions regarding Mac Shop and was responsible for day-to-day operations. In the beginning of June, 1994, according to the events log, Mac Shop started to process charges through Harbridge. Evidently, Mr. Mallett had had a disagreement with the branch manager of Citizen's Bank, took his business to People's Bank, and needed another processor. Both Mr. Mallett and his bookkeeper, on the phone at the same time, called Harbridge to open a new account.
Harbridge instructed the bookkeeper how to program the "swipe" machine and Mac Shop started accepting credit cards. When the funds failed to arrive in the checking account, Mr. Mallett called Harbridge and was told he would have to apply for a new account. When he declined to furnish a personal guarantee for the account Harbridge requested a $5,000 security deposit. Mr. Mallett testified that "that was done" but that he did not know what happened to the $5,000.
At the close of each day batch reports would be generated printing out a statement of all sales and returns indicating the net remittance.
Upon cross-examination Mr. Mallett acknowledged that although he claimed to have canceled the Peachtree account in 1991, he did not notice that he was being charged by a processor other than Citizen's Bank until three years later.
The defendant argues that even if CES is the lawful assignee of the 1991 MPA (and the Court has so declared) the personal guarantee is not operative.
Defendant accuses witness Trujillo of engaging in "Orwillian doublespeak" with pervasive bias.
Four separate areas of the witness's testimony are detailed in the memorandum and need not be recounted here.
In sum the defendant claims that the record reveals no probative or reliable evidence of the alleged debt. The defendant argues that neither Exhibit 2 nor 3 — which summarize information indicating that plaintiff is owed money for 14 separate unfunded chargebacks — meet the requirements of Rule 1006. Defendant states that Exhibit 3 may be used to the extent that the information on its face sheet comports with Rule 803(6)'s business record exception. The Court has made its ruling on the admissibility of these items and declines to revisit this issue.
The defendant states that entries 7, 8, 9, ll, and 14 (on Exhibit C) do not "show up at all" on the three tracking sheets. (Exhibits A and B). Therefore, the Court can infer per Rule 803(7) that there are no such chargebacks. The rule and the screen print of July 26, 1995 (Exhibit B) — as diagrammed on Exhibit C — permit the conclusion, defendant argues, that all chargebacks except number 3 were funded.
The seven additional reasons which are thoroughly detailed in the defendant's memorandum which defendant argues defeat liability are as follows:
 1. There is no reliable probtaive evidence that the October , 1991 MPA was assigned to the plaintiff.
 2. The 1991 MPA to which the 1991 guaranty is appended was closed in April, 1994.
 3. When the Mac Shop opened an account with Harbridge in June of 1994, there is no evidence that the defendant guaranteed that account.
 4. If not dead in April, 1994, the 1991 guaranty was surely terminated and liability fixed as of the closing of the account on March 7, 1995.
 5. There is no evidence that the chargebacks are any more than bookkeeping entries by someone acting as a collection agency that served as a clearinghouse for information because;
 6. If the chargebacks are due anyone, they are due the "BANK" in § 12 of the MPA which is the bank in paragraph 2 of the complaint.
 7. There is no evidence that the chargebacks were assigned in writing by the bank to the plaintiff; and thus, plaintiff cannot recover.
During the trial Mr. Trujillo testified exhaustively, and with great particularization, how the exhibits support the claim that plaintiff is owed $20,243.07 in chargebacks. Although the defendant accuses this witness of engaging in "Orwellian doublespeak", and testifying inconsistently, the Court's impression is the opposite. The Court found David Trujillo to be intelligent, informed and credible.
Moreover, he conducted himself as a gentleman despite undergoing an arduous cross-examination.
Defense counsel could not have been more thorough in his questioning of this witness who remained unflappable.
Defendant Myrna Mallett contends that the MPA was terminated on March 7, 1995 and, therefore, she is released from liability under the Personal Guaranty.
The MPA provides in paragraph 20 that termination must be made by written notice and "shall be effective on the third day following posting."
Before March 10, 1995, the Malletts convinced CES not to terminate the agreement. Myrna Mallett clearly took part in this urging despite her claim of being disengaged from the Mac Shop business in March 1995. Contemporaneous notes from objective employees of CES demonstrate that she was a party to the attempt to forestall termination.
Although the Court concludes that there was no effective termination, the Court would note gratuitously that even if termination did occur, Myrna Mallett's conduct estops her from avoiding her personal guarantee.
Based on the reliable and probative evidence the Court finds that the defendant is liable to the plaintiff in the amount of $20,243.07. Judgment shall enter for plaintiff in that sum. Plaintiff's counsel shall prepare the appropriate order.